**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| R & I TRADING OF NEW YORK, INC. and R Y AVIATION INC.,<br><br>    *Plaintiffs*,<br><br>    v.<br><br>EXECUTIVE AIRCRAFT INTERIORS, LLC and JETS INTERIORS LLC,<br><br>    *Defendant*s. | No. 3:20-cv-00074 (MPS) |

**RULING ON MOTION FOR SUMMARY JUDGMENT**

R & I Trading of New York, Inc. ("R & I") and R Y Aviation Inc. ("RY") (collectively, "Plaintiffs") bring this action against Executive Aircraft Interiors, LLC ("EAI") and Jet Interiors, LLC, (collectively "Defendants") alleging breach of contract and violations of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a *et seq.* ("CUTPA"), arising from their agreement for EAI to refurbish the interior of R & I's jet. Defendants assert affirmative defenses, including waiver, absence of consideration, and frustration of purpose, and a counterclaim to recover payment for outstanding invoices issued to the Plaintiffs. Plaintiffs now move for summary judgment. ECF No. 132. For the reasons set forth below, I grant in part and deny in part the motion for summary judgment, and I deny as moot a motion to strike the Plaintiffs' reply brief.

## I.    FACTUAL BACKGROUND

The following facts are taken from the parties' Local Rule 56(a) Statements and from the record and are undisputed unless otherwise indicated.

### A.  The Parties' Negotiations and Performance Under Proposal No. 1147

1

EAI is a Connecticut limited liability corporation, ECF No. 10-1 at 1, of which Seeram James is the sole member, ECF No. 137 at 16.  R & I and RY are incorporated in New York, ECF No. 1 at 2, and Ron Yeffet is the "sole owner and officer of both corporations," ECF No. 139 at 10–11.  Steve Cordrey is employed by R & I and "deal[s] with … aircraft operation."  *Id.* at 13.

In March 2018, Plaintiffs brought a Gulf Stream jet ("Aircraft") from Bank of America. *Id.* at 49, 51.  RY is the owner of the Aircraft but R & I operates the Aircraft.  ECF No. 154 at 2 ¶ 3; ECF No. 139 at 14.  The Plaintiffs decided to refurbish the interior of the Aircraft before they even purchased it because when they looked at it, they "noted that it [] still [had] the original interior," which "was kind of worn."  *Id.* at 54.

In March 2018, Plaintiffs started to look for a company to refurbish the interior of the Aircraft.  ECF No. 139 at 43.  Around March 13, 2018, Cordrey reached out to James to discuss hiring EAI for the refurbishment.  ECF No. 154 at 1 ¶ 1; *see* ECF No. 137 at 17–18.  Cordrey then emailed James asking for a quote for the refurbishment and setting forth the following list of "items" that the Plaintiffs wanted completed during the refurbishment:

- 8 Club seats, new foam and covering
- 2, 4 place divans, new foam and covering
- new carpet from the beginning of the cabin to the baggage compartment,
- re-cover the dado panels
- Aft and forward lav seats re- covered to match interior.
- New entry and galley floor. vinyl of some sort.
- Get rid of the ugly inlay in both pop up tables and conference table
- New counter tops in the lays and galley, install a larger sink in the aft lav.

ECF No. 137-3 at 1.  James understood that Yeffet owned the Aircraft through RY, ECF No. 154 at 2 ¶ 4; ECF No. 137 at 21, and that "Yeffet was shopping around for the best price" for the refurbishment project, ECF No. 154 at 2 ¶ 5; ECF No. 137 at 22.  In addition to EAI, Plaintiffs also received estimates for refurbishment from Gulf Stream, Duncan, Stevens Aviation, Weststar

Aviation, and "one or two others." ECF No. 139 at 42. Yeffet had a "target number in mind" that he wanted to spend on the refurbishment of the Aircraft and the proposals from Gulf Stream, Duncan, Stevens Aviation, and Weststar Aviation were greater than the "target number." *Id.* at 60. EAI provided the lowest estimate for the refurbishment compared to Gulf Stream, Duncan, Stevens Aviation, and Weststar Aviation. *Id.* at 271.

On March 14, 2018, James prepared a written work proposal ("Proposal No. 1147") for EAI, ECF No. 154 at 2 ¶ 7; *see* ECF No. 137 at 24; ECF No. 137-4 at 2, which Yeffet signed, ECF No. at 137-4 at 2; ECF No. 139 at 86 (Cordrey testifying that Yeffet signed the proposal). Under the proposal, EAI agreed to perform the following work:

1. "SEAT: Remove[] all seats from aircraft, remove[] old dress covers and foam and recover[] with customer selected material,"
2. "FWD & AFT DIVAN: (Leather or fabric)[:] Remove[] divan from aircraft, remove[] old dress covers and recover[] with customer selected material,"
3. "CARPET: Remove old carpet from aircraft and install customer selected carpet," and
4. "WOODWORK: Remove inlay from the two … tables and large club seating table, replace veneer and spray with high gloss to match interior."[1]

ECF No. 137-4 at 5–6; ECF No. 154 at 4 ¶ 13. In exchange for EAI's work, RY agreed to the following prices: (1) $103,00 for the seats, (2) $36,000 for the forward and aft divans, (3) $45,600 for the carpet, and (4) $20,000 for the woodwork. ECF No. 137-4 at 2. EAI's "shop rate" for labor "[had] been deeply discounted" but EAI's "standards of excellence [would] … remain unchanged." ECF No. 137-4 at 3. James explained that EAI offered such a discount for "most of [EAI's] larger jobs." ECF No. 154 at 3 ¶ 9; ECF No. 137 at 25. Further, Proposal No. 1147 states that EAI is "committed to the highest standards of QUALITY and SERVICE" and "certifies that all workmanship and material will meet or exceed industry standards." ECF No.

---

[1] Proposal No. 1147 contains another section for "countertop" but Plaintiffs decided not to refurbish the countertop and James crossed that section out. ECF No. 139 at 82.

137-4 at 4.  Proposal No. 1147 provided a "lead-time" of eight weeks and "downtime" of eight weeks from all material approval.  ECF No. 137-4 at 7.  "Lead-time" is the amount of time to obtain the materials to perform the work and "downtime" is the amount of time to perform the interior refurbishment.  ECF No. 139 at 87–88.  Proposal No. 1147 also provided a warranty for "twelve (12) months or five hundred (500) flight hours … ([whichever] one comes first) for craftsmanship associated with the interior refurbishments."  ECF No. 137-4 at 7.  James explained that if a customer complained about EAI's work and EAI confirmed that the warranty applies to the complaint within the timeframes stated in the warranty, then EAI would "cover it." ECF No. 137 at 38.

Plaintiffs brought the Aircraft to EAI's shop in Oxford, Connecticut in March of 2018. ECF No. 154 at 4 ¶ 14.  EAI performed additional work on the Aircraft besides the work described in Proposal 1147.  *See* ECF No. 137-4 at 8–9 (Invoice detailing the work performed by EAI); ECF No. 139 at 93 (Cordrey testifying that the invoice included additional work).  On May 9, 2018, Cordrey and two others traveled to Oxford to retrieve the Aircraft.  ECF No. 139 at 94, 147.  Cordrey inspected the aircraft to ensure "that the [A]ircraft [was] airworthy" and that "nothing [was] falling off, nothing [was] ripped, [and] nothing [was] torn."  *Id.* at 95–96. Cordrey had the authority from the Plaintiffs to reject the delivery of the Aircraft if it was not airworthy.  *Id.* at 100.  EAI presented an invoice dated May 9, 2018 ("Invoice 1424") to Cordrey for $83,694.68.  ECF No. 139 at 94–95; ECF No. 137-4 at 8–9.  Invoice 1424 includes a $2,764 charge for "American Express."  *Id.* at 9.  James testified that he was unaware of any written agreement by the Plaintiffs to reimburse the credit card fee but that he thought "there was one agreement … in an e-mail and it was also discussed with Ron Yeffet verbal …."  ECF No. 137 at 171.  There is also another proposal from EAI dated May 29, 2018 ("Proposal No. 1154") in

which EAI agreed to perform work on the Aircraft's headliner.  ECF No. 137-4 at 10.  Proposal No. 1154 is only signed by James.  *Id.*

About "a day or two" after the Plaintiffs took back the Aircraft, Yeffet and Cordrey inspected the Aircraft, ECF No. 139 at 102–03, noticing what they believed were flaws in EAI's work, *id.* at 103–04.  Specifically, Cordrey testified that they identified "incorrect" stitching.  *Id.* at 104.  According to James, Cordrey conveyed those complaints—that "some of the seats [were] not appropriately done" and that "[s]ome of the material was defective"—about two weeks after the Plaintiffs retrieved the Aircraft.[2]  ECF No. 137 at 47; ECF No. 154 at 4 ¶¶ 15–16.  James testified that "certain items" under Proposal No. 1147 fell below industry standards.  ECF No. 137 at 42; ECF No. 154 at 9 ¶ 32.  Around May 14, 2018, James traveled to New Jersey to discuss the issues with EAI's workmanship and materials.  ECF No. 137 at 47, 51.  Then in mid-June, EAI sent a technician to New Jersey to remove the seats from the Aircraft to address "some of the issues … identified" regarding the seats.  *Id.* at 52.  The technician took the seats to EAI's shop in Oxford, Connecticut.  *Id.*  In early July, EAI brought the seats back to New Jersey and reinstalled them in the Aircraft.  *Id.* at 52–53.  Cordrey created a list of issues with the seats, ECF No. 139 at 139–40, which included that the back leather was defective because of "large scarring," *id.* at 115–16.  Cordrey testified that the "industry standard" is to "cut" out and not use the scarred leather material.  *Id.* at 116.  On July 5, 2018, Cordrey sent James two emails with the subject lines, "Stitching" and "Stitching 2," and with pictures of the Aircraft's seats.  ECF No. 139-3; ECF No. 139-4.  James testified that "a little bit after" EAI reinstalled the seats, *id.* at 54–55, Cordrey informed him that the Plaintiffs still had issues with EAI's work, *id.* at 53, and that

---

[2] It is not clear from James's testimony when he received these complaints.  He testified that it took "[a]bout two weeks" after the Plaintiffs retrieved the Aircraft but he also testified that he received the complaints "[p]robably close" to May 11, 2018.  ECF No. 137 at 46–47.

"Yeffet would not make any further payments on the project until the work was corrected," *id.* at 55; ECF No. 154 at 5 ¶ 20.  Cordrey testified that he told EAI that RY would "not pay[] another dime of this invoice because [EAI] did not uphold [its] end of the [the] contract."  ECF No. 139 at 195; ECF No. 154 at 6 ¶ 22.  EAI's second attempt to recover the Aircraft's seats cost it "about $35,000."  ECF No. 154-1 ¶ 5.

During the summer of 2018, EAI performed other work on the Aircraft in addition to the seats.  *See e.g.*, ECF No. 137 at 169 (James testifying that EAI performed additional work on the Aircraft's headliner and side panels).  EAI sent RY three other invoices during that summer: (1) an invoice dated June 2, 2018 ("Invoice 1433") for $6,750, ECF No. 137-4 at 11; ECF No. 137 at 170, (2) an invoice dated July 4, 2018 ("Invoice 1454") for $15,190, ECF No. 137-4 at 12; ECF No. 137 at 169, and (3) an invoice dated July 10, 2018 ("Invoice 1457") for $450, ECF No. 137-4 at 13; ECF No. 137 at 170.

On November 26, 2018, Seth Newman purchased the assets of EAI through an entity, Jet Interiors.[3]  ECF No. 154 at 12 ¶ 43; *see* ECF No. 138 at 9, 16; ECF No. 137 at 40–41.  After November 26, 2018, "EAI did not perform any further work on behalf of [the Plaintiffs]."  ECF No. 137 at 16; ECF No. 154 at 11 ¶ 41.

### B.  The Remediation Agreement

Cordrey and a colleague prepared an initial draft of a new agreement, ECF No. 139 at 197; ECF No. 154 at 7 ¶ 26, which the Plaintiffs later called the "Remediation Agreement," ECF No. 139 at 20–21.[4]  On July 7, 2018, Cordrey sent the initial draft to James.  ECF No. 137-6 at 1. James forwarded the draft to Chris James, another EAI employee, who responded that EAI

---

[3] The parties stipulate that EAI and Jet Interiors would be jointly and severally liable if the Plaintiffs prevail.  ECF No. 121-1 at 1; ECF No. 122.

[4] Defendants dispute that the "Remediation Agreement" is a contract at all but I will refer to the document as the "Remediation Agreement" for ease of reference.

should insert language that R & I "will pay partial prior and balance upon completion." *Id.*; ECF No. 137 at 65; *see* ECF No. 154 at 7 ¶ 26. James drafted another version of the Remediation Agreement and sent it to Cordrey and Yeffet on July 16, 2018. ECF No. 137 at 166–67; ECF No. 137-15; *see* ECF No. 154 at 7 ¶ 27. James's draft contained a list of "[i]tems that need[ed] to be addressed" and stated that R & I would pay $20,000 "for partial payment for work that is completed." ECF No. 137-15 at 1. Further, James's draft provided that "[o]nce all these items have been rectified all invoices will be reviewed, explained and agreed upon by both parties and paid in full." *Id.* On July 17, 2018, EAI and R & I executed the final version of the Remediation Agreement. ECF No. 137-5. James signed the Remediation Agreement on behalf of EAI and Yeffet signed on behalf of R & I. ECF No. 137-5; *see* ECF No. 137 at 58; ECF No. 134 ¶ 3. The Remediation Agreement provided as follows:

### Agreement between Executive Aircraft Interiors and R & I Trading of New York

This agreement is to be entered between Executive Aircraft Interiors (EAI) and R & I Trading of New York (R &I), whereas EAI was hired by R &I in April of 2018 to perform custom interior work on aircraft GV615. Whereas EAI acknowledges the work performed to be unsatisfactory and materials used to be damaged and defective. Since their acknowledgement, EAI has made one failed attempt to rectify issues associated with the aircraft's interior as a result of their work. R & I has therefore agreed to provide EAI an additional opportunity to remedy the items listed below.

The following items are expected to be addressed and remedied on a time frame and schedule that is conductive to R&I and deemed as such. It is understood and agreed, that all costs associated with the remediation of the following listed items will be at no charge to R&I. (This includes but not limited to; cost of material, labor, etc.)

- All seats and sofa leather to be free of all defects.
- All stitching to be straight and uniform.
- All leather covering to fit tight and without wrinkle, pulls, or gaps.
- Wine bottle rack to be manufactured and installed in left galley cabinet.
- Galley floor covering to fit correctly (right galley corner below sink too large - does not lie down).

> R &I Trading to pay Executive Aircraft Interiors twenty thousand dollars ($20,000.00) for partial payment for work that is completed.
>
> It is agreed, that ALL of the items referenced above are to be fully rectified and professionally completed to the satisfaction of R & I.

ECF No. 137-5 at 1. James testified that certain aspects of the items described in the Remediation Agreement, such as defective leather, would be covered by the warranty, ECF No. 137 at 59–62, and that EAI raised those issues within Proposal No. 1147's warranty period, *id.* at 59. On July 17, 2018, R & I paid EAI $20,000 as set forth in the Remediation Agreement. ECF No. 137 at 68–69; ECF No. 137-7 at 1; *see* ECF No. 154 at 10 ¶ 38. On October 31, 2018, Cordrey received another estimate from Gulfstream for the refurbishment of the Aircraft's interior. ECF No. 154-6 at 1. Reacting to the estimate, Cordrey wrote "Ouch! I don't think James is going to agree with 290k to get out of redoing the seats!!!" *Id.*

Between July 2018 and December 2018, Cordrey testified, there were phone calls between the parties, "disapproving [leather] samples," ECF No. 139 at 213, and the Plaintiffs rejected "multiple [leather] samples" that EAI sent them, *id.* at 269. On December 5, 2018, Cordrey emailed James to "check[] in to see where [he was] with the additional leather samples." ECF No. 137-8 at 1; ECF No. 137 at 69; *see* ECF No. 154 at 11 ¶ 39. Cordrey also emailed James with "some links to leather suppliers [that Yeffet] would like [him] to look into." ECF No. 137-8 at 2. James responded to the links that he would "check on it." *Id.*; ECF No. 137 at 70. James testified that he would "look into" the proposed leather samples to "fulfill EAI's obligations" under the Remediation Agreement. *Id.* at 69–70. On January 11, 2019, Cordrey emailed James "a picture of the leather that [had] been chosen" and stated that the Aircraft was "scheduled to go [to] Westfield on Monday March 4th" for three weeks of downtime. ECF No. 137-9 at 1; ECF No. 137-11 at 1 (stating that the Aircraft would be in Westfield, Massachusetts

in March).   James testified that Cordrey had selected a sample in the email and that after a

sample was approved, the company responsible for the leather would create a "production

sample."  ECF No. 137 at 71–73.  James also testified that he told Cordrey that EAI would "need

six to eight weeks to order the material."  ECF No. 137 at 71.  On February 4, 2019, Cordrey

traveled to EAI's shop in Oxford, Connecticut "to approve the color match for the leather."  *Id.*

at 83.  James testified that he could not order the leather yet because Yeffet needed to approve

the leather selected.  *Id.*  On February 5, 2019, James emailed Yeffet, Cordrey, and others as

follows:

> Hello Ron base[d] on the sample leather you pick from Perrone Aerospace
> Executive Aircraft Interiors had the leather dyed to your request the color is paper
> Moon and the pattern is Noble part # NBL -7627. Steve came up to my shop on
> Monday and he did approve the leather on fortunately [sic] it's not Steve Aircraft I
> would like you to approve the color and grain of this leather[.] It's a very expensive
> leather.
> Base[d] on the past experience these are the open Invoice
> Invoice # 1424 for $ 2,764.34
> Invoice # 1433 for $ 6,750.00
> Invoice # 1457 for $ 450.00
> Invoice # 1454 for $15,190.00
> There is also a $ 5,000.00 credit card fee you promised to take care of and it never
> happen[ed].
> There will be a 15% charge for the used of all seat for almost one year
> Total for seat only not divan was $103,000 15% $15,450.00
> After The seat is are [sic] complete Ron you or one of your representatives must
> come to Executive Aircraft Interior in oxford ct to do a visual inspection and
> approval before all seat [sic] leave our company all invoice must be paid in full .
> Before any leather order place these term must be satisfied and Agree on please
> sign below if accepted if not please make comment on a separate sheet .
> After this job is completed there will be no additional warranty movie [sic] going
> FWD.

ECF No. 137-10 at 1.  In response, Cordrey asked James to "send detailed invoices for all

4 unpaid invoices."  *Id.*  On February 18, 2019, Cordrey inspected and Yeffet approved

the "production sample" of the leather.[5]  ECF No. 137 at 73.  James placed an order for the leather on February 19, 2019.  *Id.* at 86–87.

On March 15, 2019, James emailed Cordrey and Yeffet that he would not have the leather in time to meet the schedule to reupholster the seats.  ECF No. 137-11 at 1.  In addition, James wrote that since the Aircraft would be in Savannah, Georgia, EAI would have to arrange to remove the seats from the Aircraft and bring them to EAI's shop or EAI could pick up and drop off the seats for a fee.  *Id.*  James also stated "[w]e also have to have a [firm] and final agreement with Ron Yeffet and Seeram James before starting this project."  *Id.*  Cordrey responded that James's "terms are not acceptable" and that "there already is a signed agreement between yourself and Ron Yeffet."  *Id.*  Cordrey stated that the Aircraft would be in Savannah over the summer "for a longer period of time which [would] allow [EAI] to complete the rework of the seats" but that EAI would "have to pick up the seats and drop them back off … at [EAI's] expense."  *Id.*  Newman testified that "a large amount of time transpired between [the] date of accepting the leather to be used for the project and making the airplane available on short notice to be worked on."  ECF No. 138 at 100.  Newman also testified that "typically a customer would notify the company of when it would deliver the airplane to be fixed with sufficient notice" and that he believed that sufficient notice was "[a]t least a couple of months."  *Id.* at 101; ECF No. 154 at 12 ¶ 43.

On April 2, 2019, James emailed Cordrey that the leather had arrived.  ECF No. 137-12 at 1.  Around April 11, 2019, Cordrey traveled to EAI's shop to inspect the leather, ECF No. 154 at 14 ¶ 50; ECF No. 137 at 98, and told James that he would advise him "of the next opportunity

---

[5] The parties disagree over when the Plaintiffs approved the leather.  Defendants argue that Yeffet approved the leather on February 18, 2019, while Plaintiffs argue that they approved the leather on January 11, 2019.  ECF No. 154 at 11–12 ¶ 42; ECF No. 157 at 15 n.5.

to finish the job," *id.* at 99; ECF No. 154 at 15 ¶ 54.  In addition, during the April 11 meeting, James told Cordrey that Newman was going to "honor … redo[ing] [the Aircraft's] seats at cost." ECF No. 137 at 101.  James testified that by the April 11 meeting, he "believe[d]" that the warranty had expired but that during the meeting, the parties did not discuss the warranty and he was "more concerned [about] honoring the job at the time to keep the reputation of [EAI]."  *Id.* at 105.  He also testified that at the April 11 meeting, he did not believe that the sale of EAI to Jet Interiors "absolved EAI of its obligation" under the Remediation Agreement.  *Id.* at 106; ECF No. 154 at 17 ¶ 60.

On September 6, 2019, Cordrey emailed James stating that the Aircraft would be in Teterboro on October 7, during which EAI could "remove the seats and install ballast."  ECF No. 154-11 at 1; *see* ECF No. 154 at 17 ¶ 61.  Cordrey stated that the Aircraft was scheduled to travel to Savannah for maintenance on October 10, 2019.  *Id.*  Newman responded to Cordrey, identifying himself as the "new principal" of EAI and stating that James had "retired from the business."  ECF No. 138-5 at 2; ECF No. 154 at 17 ¶ 62.  In response, Cordrey stated that he was aware that James had retired but that he was told that James "would be finishing this project." ECF No. 138-5 at 2; ECF No. 154 at 18 ¶ 63.  Newman then asked Cordrey to call James.  ECF No. 138-5 at 2; ECF No. 154 at 18 ¶ 64.  On September 18, 2019, James emailed Cordrey as follows:

> The agreement in the past is not valid any more base[d] on the term of the proposal dated on March 14 2018. Our warranty stated very clearly on the proposal was one year or 500 hrs. which ever come first and they [both] expired.
>
> Base[d] on the situation of the job we, re- upholster[ed] the seat for the second time and you guys [were] still not happy it cost me over $35,000 dollars at the time, along with the rest of the interior for below cost just to make things right, agreed to purchase new leather that's still [sitting] in the shop.

Ron took over 5 - 6 attempts before he selected a leather, before we could move to order leather. I advised you several times it takes 6 to 8 weeks to order custom leather, it was 4 weeks before the aircraft went in for service when he finally agreed on a specific leather.

There is several open invoice[s] still not paid on job that was completed along with credit for the American Express that Ron promised to [pay] they all total about $25,000 and $15,000 on leather that I order when we were doing the interior we did the table inlay three times because his wife change[d] her mind also, the glass and draw organizer was built 2 times because she change[d] her mind all the time.

At this time I am not willing to warranty any of the seat[s] you can take the credit that is balance and the Leather that I have for the seat[s] and get your job any where you like[.]

[A]lso Executive Aircraft Interior is sold to the new owner Jet Interior and would not have any responsibility of this job what so ever. Seth Newman is also well aware of this [situation.]

Please make arrange to pick up the leather if you like or you can negotiate with Jet Interior. Seth Newman to complete the job [at] your [expense].

ECF No. 137-13 at 1.  James testified that this September 18 email was the "first time" he told Cordrey that EAI would not honor the Remediation Agreement because the warranty had expired.  ECF No. 137 at 122–23; *see* ECF No. 138 at 54–55 (Newman testifying that the first time that James indicated that the warranty had expired was in his September 18 email).  James and Newman could not provide the exact date that the warranty expired.  ECF No. 154 at 19 ¶ 68.  James also testified that his statement that Jet Interiors had no obligation to complete this job had "nothing to do with the asset purchase agreement" but rather his "decision not to continue doing the job" because "[t]he time expired and the customer did not give me adequate opportunity to complete the job." ECF No. 137 at 130–31.  EAI never corrected the issues identified in the Remediation Agreement.  ECF No. 137 at 173.

**II.    PROCEDURAL HISTORY**

On January 15, 2020, Plaintiffs filed suit against EAI, claiming breach of contract and a CUTPA violation.  ECF No. 1.  On July 31, 2020, Plaintiffs filed an Amended Complaint, adding Jet Interiors as a defendant.  ECF No. 36.   EAI filed an answer with a counterclaim, alleging that the Plaintiffs failed to pay the outstanding invoices, and with the following affirmative defenses: (1) waiver, [6]  (2) absence of consideration, (3) frustration of purpose, (4) set-off, and (5) failure to state a CUTPA claim.  ECF No. 73.  Plaintiffs now move for summary judgment on their breach of contract and CUTPA claims and on the EAI's counterclaim and affirmative defenses.  ECF No. 132.  In response to the Plaintiffs' reply in support of their motion for summary judgment, the Defendants filed a motion to strike the reply because it exceeded the page limits imposed by Local Rule 7(d).  ECF No. 159.  Plaintiffs filed a motion for leave to file excess pages *nunc pro tunc*, ECF No. 159, which I granted, ECF No. 163.

### III.    LEGAL STANDARD

"Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (internal quotation marks and citations omitted).  In reviewing the summary judgment record, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013).  "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor."  *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013).  The moving

---

[6] In their opposition to the motion for summary judgment, Defendants state that they "will amend their Answer and withdraw their defense of waiver."  ECF No. 153 at 34 n.8.  Thus, I will not address Plaintiffs' arguments about waiver in this ruling.

party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

## IV. DISCUSSION

In its motion for summary judgment, the Plaintiffs argue that there is no genuine dispute of material fact that (1) EAI materially breached Proposal No. 1147 and repudiated its contractual obligations under the Remediation Agreement, ECF No. 133 at 16–22, (2) the Plaintiffs are entitled to $291,314 in damages as a result of EAI's breach of contract, *id.* at 25–30, and (3) EAI acted in bad faith and deceptively, *id.* at 30–34. Further, Plaintiffs argue that Defendants' affirmative defenses and counterclaim fail. ECF No. 133 at 21–25. Defendants counter that (1) the Remediation Agreement is not enforceable because it is illusory and too indefinite and because it fails for lack of consideration, ECF No. 153 at 10, (2) even if the Remediation Agreement was an enforceable contract, Plaintiffs acted in bad faith, creating a genuine dispute as to whether, as Plaintiffs allege, EAI committed an anticipatory breach of the agreement, *id.* at 17–18, (3) the Court should not accept the Plaintiffs' expert report to calculate damages, *id.* at 19–23, and (4) there is a genuine dispute of material fact as to whether EAI acted in bad faith and deceptively, *id.* at 23–34. Defendants also argue that there are genuine disputes of material fact as to whether Plaintiffs' conduct led to frustration of purpose, *id.* at 35, and that Defendants should prevail on their counterclaim because Plaintiffs failed to pay the outstanding invoices, *id.* at 36–37. I find that the Remediation Agreement is an enforceable contract but because there are genuine disputes of material fact as to whether both the Plaintiffs and the

14

Defendants acted in bad faith, I deny summary judgment as to the Plaintiffs' breach of contract and CUTPA claims and the Defendants' counterclaim and affirmative defense of setoff.  I grant summary judgment, however, against the Defendants as to their affirmative defenses of frustration of purpose and absence of consideration.

### A.   *The Remediation Agreement is an Enforceable Contract*

Plaintiffs claim that EAI breached its obligations under the Remediation Agreement. ECF No. 36 ¶ 40.  Defendants argue that the Remediation Agreement imposed no enforceable obligations on EAI.  I address these claims below.

### i.   The Remediation Agreement is Not Illusory

Defendants argue that the Remediation Agreement is not enforceable because it "uses ambiguous language that creates illusory obligations and indefinite standards."  ECF No. 153 at 12.  Defendants point to the Agreement's language requiring EAI to do work "on a timeframe and schedule that is conducive to R & I," requiring the items listed "to be fully rectified and professionally completed to the satisfaction of R & I," and requiring EAI to absorb "all costs associated … at no charge to R & I."  *Id.* at 12.  I disagree that such language makes the Remediation Agreement illusory and find that the Agreement is sufficiently definite to form a contract.

"Words of promise do not constitute a promise if they make performance entirely optional with the purported promisor ... [w]here the apparent assurance of performance is illusory it is not consideration for a return promise."  *O'Sullivan v. Bergenty,* 214 Conn. 641, 656 (1990) (Shea, J., dissenting) (quoting 1 Restatement (Second), Contracts §§ 76–77). [7]  "One of the most common types of promise that is too indefinite for legal enforcement is the promise

---

[7] The parties agree that Connecticut law applies to this dispute.  ECF No. 133 at 16 (Plaintiffs' brief arguing that Connecticut law applies); ECF No. 153 (Defendants' brief citing primarily Connecticut cases).

where the promisor retains an unlimited right to decide later the nature or extent of his or her

performance. This unlimited choice in effect destroys the promise and makes it illusory."

*Powanda v. Inteplast Grp., Ltd.*, No. 3:14CV846 JBA, 2015 WL 1525737, at *3 (D. Conn. Apr.

3, 2015), *opinion clarified on denial of reconsideration sub nom.*, 2015 WL 4078117 (D. Conn.

July 6, 2015) (quoting 1 Williston on Contracts § 4:27 (4th ed.)).  But "[i]f there is a restriction,

express or implied, on the promisor's ability to terminate or to refuse to perform, the promise is

not illusory. The tendency of the law is to avoid the finding that no contract arose due to an

illusory promise when it appears the parties intended a contract."  *Sicaras v. City of Hartford*, 44

Conn. App. 771, 780 (1997) (quoting 2 A. Corbin, Contracts (Rev. Ed.1995) § 5.28, p. 149).

"An implied obligation to use good faith is enough to avoid the finding of an illusory promise."

*Id.* at 781.  More specifically, the law imposes a duty of good faith on the parties when

contractual language permits them to exercise discretion.  *See Richards v. Direct Energy Servs.,*

*LLC*, 915 F.3d 88, 94, 105 (2d Cir. 2019) (applying Connecticut law and holding that where

defendant could change the "variable rate" charged in plaintiff's monthly bills based on several

factors, "[t]he implied covenant of good faith and fair dealing obliged [defendant] to act in good

faith when it set the variable rate, and 'good faith is enough to avoid the finding of

an illusory promise'" (quoting *Sicaras*, 44 Conn. App. at 781)).  Further, "[an] agreement will

often use language such as 'satisfaction' or 'complete satisfaction' without making it clear that

the test is merely one of honest satisfaction rather than of reasonable satisfaction. Under any

interpretation the exercise of judgment must be in accordance with the duty of good faith and fair

dealing (§ 205) and for this reason, the agreement is not illusory (§ 77)."  *Graham v. Boehringer*

*Ingelheim Pharms.*, No. CV040488908S, 2007 WL 3317528, at *9 (Conn. Super. Ct. Oct. 19,

2007).

These cases foreclose Defendants' argument that the Remediation Agreement is not an enforceable contract because it requires EAI "to do whatever the Plaintiffs want, whenever they want, and wherever they want."  ECF No. 153 at 12.  The law imposes on R & I an implied covenant of good faith and fair dealing in exercising its discretion under the Remediation Agreement.  Thus, while the Remediation Agreement gives R & I considerable discretion in designating the time and location of EAI's work, R & I's discretion is limited by its duty of good faith.  Further, the Remediation Agreement's requirement that the issues "be fully rectified and professionally completed to the satisfaction of R & I" means that R & I must honestly be dissatisfied with the work to be excused from its own obligations and cannot, for example, withhold its approval simply to avoid paying or for other reasons amounting to bad faith.

The cases Defendants cite on this issue, ECF No. 153 at 13–14, only reinforce the point. In all of those cases, the courts interpreted a contract or imposed a duty on the parties to the contract to avoid a finding of an illusory contract.  *See, e.g.*, *Quiello v. Reward Network Establishment Servs., Inc.*, 420 F. Supp. 2d 23, 30–31 (D. Conn. 2006), *adhered to on reconsideration*, 2006 WL 1359329 (D. Conn. May 17, 2006) ( "to avoid the creation of an illusory contract," the court rejected interpretation that would allow defendant to change commission rate after  plaintiff procured a contract and adopted interpretation that plaintiff was entitled to the commission rate on day that he procured contract); *Hartford Elec. Applicators of Thermalux, Inc. v. Alden,* 169 Conn. 177, 179–80 (1975) (where the contract conditioned payment on the approval by the architect, who was party to the contract, the court imposed on the architect a "duty to inspect the work and to specify those items which must be corrected in order to secure his approval" because "otherwise, the contractor's promise to pay would be illusory").

Therefore, I conclude that the language in the Remediation Agreement affording discretion to R & I does not make the Agreement "illusory," but, instead, imposes on R & I a duty to act in good faith when selecting the time, location, and the standard for EAI's work.

> ii.    The Remediation Agreement is Supported by Consideration

Defendants argue that the Remediation Agreement is not supported by consideration because the $20,000 payment mentioned in the Remediation Agreement was for work EAI already completed under Proposal No. 1147 and "past consideration … cannot support the imposition of a new obligation."  ECF No. 153 at 16.  Plaintiffs contend that EAI materially breached Proposal No. 1147, excusing RY from making further payments to EAI under that proposal.  ECF No. 157 at 13–14; *see United States v. Cohan*, 111 F. Supp. 3d 166, 172 (D. Conn. 2015), *aff'd*, 667 F. App'x 6 (2d Cir. 2016) ("Under Connecticut law, 'a total breach of the contract by one party'—that is, 'an uncured material failure of performance'—'relieves the injured party of any further duty to perform further obligations under the contract.'" (quoting *Bernstein v. Nemeyer*, 213 Conn. 665, 672–73 (1990) and *Shah v. Cover–It, Inc.*, 86 Conn.App. 71, 75 (2004) (emphasis omitted)).  Therefore, Plaintiffs argue, "EAI's promise to correct the work, under a higher standard of performance – in exchange for $20,000 – does not fail for lack of consideration."  *Id.*  I agree with the Plaintiffs that the undisputed evidence in the record shows that the Remediation Agreement is supported by consideration.

"The doctrine of consideration is fundamental in the law of contracts, the general rule being that in the absence of consideration an executory promise is unenforceable."  *Connecticut Nat. Bank v. Voog*, 233 Conn. 352, 366 (1995) (citation omitted).  "[C]onsideration is [t]hat which is bargained-for by the promisor and given in exchange for the promise by the promisee.... We also note that [t]he doctrine of consideration does not require or imply an equal exchange

between the contracting parties.... Consideration consists of a benefit to the party promising, or a loss or detriment to the party to whom the promise is made." *Martin Printing, Inc. v. Sone,* 89 Conn.App. 336, 345 (2005) (citation omitted).

"It is axiomatic that past consideration cannot support the imposition of a new obligation." *Gorman v. Earmark, Inc.*, 968 F. Supp. 58, 63 (D. Conn. 1997) (citing *Dick v. Dick*, 167 Conn. 210, 224 (1974)). "The basis of the rule is generally made to rest upon the proposition that in such a situation he who promises the additional compensation receives nothing more than that to which he is already entitled and he to whom the promise is made gives nothing that he was not already under legal obligation to give. … Where, however, the subsequent agreement imposes upon the one seeking greater compensation an additional obligation or burden not previously assumed, the agreement, supported by consideration, is valid and binding upon the parties." *Brian Const. & Dev. Co. v. Brighenti*, 176 Conn. 162, 166 (1978) (citation omitted). Thus, "when a party agrees to perform an obligation for another to whom that obligation is already owed, although for lesser remuneration, the second agreement does not constitute a valid, binding contract." *Id.*

The undisputed evidence in the record shows that EAI materially breached Proposal No. 1147. "[W]hether there has been a material breach of a contract—that is, a breach that goes to the root or essence of the agreement between the parties, or ... which touches the fundamental purpose of the contract and defeats the object of the parties in entering into the contract,—is a question of fact." *Cohan*, 111 F. Supp. 3d at 172–73 (internal quotation marks, citation, and brackets omitted). "The following factors are relevant to this determination: (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of

which he will be deprived; (c) the extent to which the party failing to perform or to offer to

perform will suffer forfeiture; (d) the likelihood that the party failing to perform or to offer to

perform will cure his failure, taking account of all the circumstances including any reasonable

assurances; (e) the extent to which the behavior of the party failing to perform or to offer to

perform comports with standards of good faith and fair dealing." *Id.* at 173 (citing

*Bernstein*, 213 Conn. at 672 n. 8 (quoting Restatement (Second) of Contracts, § 241)).

Here, RY contracted EAI to refurbish the interior of the Aircraft. That work included

EAI's reupholstering the Aircraft's seats. *See* ECF No. 137-4 at 5 (EAI agreeing to "[r]emove[]

all seats from the aircraft, remove[] old dress covers and foam and recover[] with customer

selected material"). Under Proposal No. 1147, EAI certified that "all workmanship and material

will meet or exceed industry standards." Thus, Plaintiffs reasonably expected that the

workmanship and the materials used on the seats, as well as the other items listed in the proposal,

would "meet or exceed industry standards." After EAI's initial attempt to reupholster the seats,

Cordrey and Yeffet raised issues concerning the workmanship on the seats and the material used.

And after the EAI's second attempt to reupholster the seats, Cordrey noted issues such as EAI's

use of leather with scarring, which he testified fell below industry standards. James admitted

that "certain items" under Proposal No. 1147 fell below industry standards. Further, in the

Remediation Agreement, EAI acknowledged that its "work performed [was] unsatisfactory and

materials [were] damaged and defective," that it made "one failed attempt to rectify issues

associated with the aircraft's interior as a result of their work," and that R & I agreed "to provide

EAI an additional opportunity to remedy the items listed [in the Agreement]." This language

cannot be squared with Defendants' assertion that EAI did not admit it was in material breach.

*See* ECF No. 153 at 16. One cannot agree that one is receiving from one's counter-party "an

20

additional opportunity to remedy" work that one acknowledges to be "unsatisfactory" and also admit that one has made a "failed attempt" to rectify one's performance while at the same time denying that one has materially breached.  Material breach is a breach that excuses performance by the counter-party.  There would thus be no reason for that counter-party to afford "an additional opportunity" to remedy performance in the absence of a material breach.

And while material breach is generally a question of fact, Defendants still must submit some evidence on that question to permit a reasonable juror to find in their favor, and they have no done so.  They have submitted no evidence suggesting that EAI's original performance "met or exceed[ed] industry standards," as contemplated by Proposal No. 1147.  Indeed, Defendants do not even argue that it did.  Therefore, because there is no genuine dispute of material fact that EAI's workmanship and materials used fell below industry standards, depriving RY of the "benefit which [it] reasonably expected" under Proposal No. 1147, I find that EAI materially breached Proposal No. 1147.  And because EAI materially breached, RY is excused from any further obligations under Proposal No. 1147—including the obligation to make further payments.

Because the undisputed evidence shows that EAI had materially breached Proposal No. 1147 when R & I entered into the Remediation Agreement, RY was excused from its obligation to pay for EAI's work under Proposal No. 1147.  It follows that the Remediation Agreement imposed new obligations on the parties.  Specifically, R & I[8] agreed to pay $20,000 to EAI for work that it otherwise did not have to pay for.  In addition, EAI received an opportunity to cure its admittedly defective performance, restore (or maintain) its reputation for quality work, and

---

[8] R & I itself was not a party to the original Proposal No. 1147; rather its related entity, RY, was.  But the analysis does not depend on that circumstance because RY's payment obligation was excused due to EAI's material breach.

secure payment in full.  Therefore, EAI received benefits under the Remediation Agreement to which it was not previously entitled.

I conclude that there is no genuine dispute of material fact that the Remediation Agreement is an enforceable agreement.

### B. There is a Genuine Dispute of Material Fact About Whether the Plaintiffs and the Defendants Breached the Remediation Agreement

Plaintiffs argue that James repudiated the Remediation Agreement in his September 18, 2019 email, which stated that Remediation Agreement was no longer valid due to an expired warranty and EAI's sale of its assets to Jet Interior.  ECF No. 133 at 17.  Defendants counter that James had "good faith explanations" for his decision to cease any work under the Remediation Agreement and that Plaintiffs' "bad faith conduct creates a question of fact as to whether … James materially breached" the Remediation Agreement.  ECF No. 153 at 18. [9]

"An anticipatory breach of contract occurs when the breaching party repudiates his duty before the time for performance has arrived."  *Pullman, Comley, Bradley & Reeves v. Tuck-it-away, Bridgeport, Inc.*, 28 Conn. App. 460, 465 (1992) (citing *Martin v. Kravanewsky*, 157 Conn. 514 at 518–19 (1969)).  "Its effect is to allow the nonbreaching party to discharge his remaining duties of performance, and to initiate an action without having to await the time for performance."  *Id.* (citation omitted).  "The manifestation of intent not to render the agreed upon performance may be either verbal or nonverbal … and is largely a factual determination in each instance." *Id.* (citations omitted).  "Repudiation is actionable only in the absence of breach or

---

[9] Plaintiffs argue that James's claim that EAI's sale absolved EAI of its obligations under the Remediation Agreement was "completely without merit," ECF No. 133 at 17, because, Plaintiffs contend, James admitted that EAI was still obligated to perform under the Remediation Agreement despite the sale, *id.* at 19–20.  Defendants argue only that James had "good faith explanations."  ECF No. 153 at 17.  Because Defendants do not offer any detail on this issue, I assume that James's reliance on the sale to Jet Interior has been rendered moot by the stipulation that both EAI and Jet Interior are jointly and severally liable for any breach of contract.  *See* ECF No. 121-1.

repudiation by the other contracting party; only a party himself not in default has the right to claim that the other party's manifestation of an intention not to perform constitutes a breach of the contract." *Gilman v. Pedersen*, 182 Conn. 582, 584 (1981); *see also McCarthy v. Spakowski*, No. CVH 5909, 1998 WL 732968, at *2 (Conn. Super. Ct. Oct. 10, 1998) ("In order for the repudiation to be actionable, the non-breaching party must be in substantial conformity with the requirements of the contract." (internal quotation marks and citations omitted)).

There is a genuine dispute of material fact as to whether Plaintiffs acted in "substantial conformity with the requirements of the contract," and, thus, may sue for anticipatory breach. As discussed above, there is a duty of good faith and fair dealing imposed on R & I's ability to dictate the "time frame and schedule" for EAI to correct its work under the Remediation Agreement. The parties executed the Remediation Agreement on July 16, 2018. On January 11, 2019, Cordrey emailed James with a picture of leather that he selected and told James that the Aircraft was scheduled to go to Westfield, Massachusetts in March of 2019. James told Cordrey that he needed six to eight weeks to order the leather. On February 5, 2019, James emailed Cordrey and Yeffet that he needed Yeffet's approval of the leather before he could place an order. On February 18, 2019, Yeffett approved the leather sample. The parties dispute when the Plaintiffs chose the leather for the seats. Plaintiffs argue that they selected the leather on January 11, 2019, when Cordrey emailed James with a picture of the leather. ECF No. 157 at 15 n.5. Defendants argue, however, that Yeffet approved the leather on February 18, 2019. ECF No. 153 at 8. A reasonable juror could find in favor of Defendants on this point, in part because James actually ordered the leather on February 19, 2019, the day after he understood Yeffet to have approved it. Cordrey told James that the Aircraft would be in Savannah, Georgia for maintenance over the summer, and EAI could pick up the seats there, correct the issues, and drop

them off.  Then on September 6, 2019, Cordrey emailed James that the Aircraft was scheduled to be in Teterboro on October 7, 2019, and EAI could remove the seats there.  The Aircraft was then to travel to Savannah, Georgia on October 10, 2019.  Newman testified that "typically," aircraft interior refurbishing companies need "at least a couple of months" notice to work on the airplane.

When drawing all reasonable inferences in favor of EAI, a reasonable juror could find that R & I's "time frame and schedule" were unreasonable and that R & I acted in bad faith. First, a reasonable juror could conclude that R & I's expectation that EAI could obtain the leather in time to reupholster the seats in March of 2019 was unreasonable and in bad faith, especially given the delays by R & I in approving the leather.  When drawing all reasonable inferences in favor of EAI, I find that the evidence suggests that (1) Cordrey knew that James needed six to eight weeks to order the leather, (2) Cordrey was aware that James required Yeffet's approval to order the leather, and (3) Yeffet did not approve the leather until February 18, 2019.  That timeline gave EAI only one month to order and receive the leather before the Aircraft was scheduled to be in Westfield, Massachusetts.  Second, a reasonable juror could also find that R & I acted in bad faith by demanding that EAI retrieve the seats from Savannah, Georgia—a substantial distance from EAI's facilities in Connecticut—at its own expense.  And third, a reasonable juror could find that Cordrey's request on September 9, 2016 for EAI to retrieve the seats from Teterboro, New Jersey on October 7, 2019 was also in bad faith.  As Newman's testimony indicated, aircraft interior refurbishing companies require at least a "couple of months[']" notice to work on an airplane but Cordrey gave EAI only a month's notice before the scheduled work.  The implied good faith covenant in the Remediation Agreement precludes

any reading of the requirement that EAI perform the work "on a time frame and schedule …

conducive to R & I" that would place EAI at R & I's beck and call.

Because there is a genuine dispute of material fact as to whether Plaintiffs breached their

obligation to act in good faith under the Remediation Agreement, I cannot grant summary

judgment on the Defendants' anticipatory breach claim. *Gilman*, 182 Conn. at 584 (stating that a

plaintiff's "statement might have constituted an anticipatory repudiation … had the defendant's

performance at that time been in substantial conformity with the requirements of the contract").

I therefore decline to grant summary judgment as to the Plaintiffs' breach of contract claim.[10]

### C. There are Genuine Disputes of Material Fact as to Whether the Plaintiffs Are Obligated to Pay the EAI's Invoices

EAI asserts in its counterclaim that Plaintiffs owe EAI (1) $15,190 for prior work, (2)

$2,764.34, $6,750, and $450, respectively, for three other outstanding invoices from July of

---

[10] Defendants assert frustration of purpose as an affirmative defense, arguing that Plaintiffs' conduct in delaying the selection of the leather led to EAI's failure to work on the Aircraft in Westfield, Massachusetts, and asking Defendants to retrieve the seats from Savannah, Georgia frustrated the purpose of the Remediation Agreement.  ECF No. 153 at 35.  I disagree.

"The doctrine of frustration of purpose … excuses a promisor in certain situations where the objectives of the contract have been utterly defeated by circumstances arising after the formation of the agreement. … Excuse is allowed under this rule even though there is no impediment to actual performance."  *Hess v. Dumouchel Paper Co.*, 154 Conn. 343, 350–51, 225 A.2d 797, 801 (1966).  "A party claiming that a supervening event or contingency has frustrated, and thus excused, a promised performance must demonstrate that: (1) the event substantially frustrated his principal purpose; (2) the nonoccurrence of the supervening event was a basic assumption on which the contract was made; (3) the frustration resulted without the fault of the party seeking to be excused; and (4) the party has not assumed a greater obligation than the law imposes."  *O'Hara v. State*, 218 Conn. 628, 638 n.7 (1991) (citing Restatement (Second) Contracts § 265 and E. Farnsworth, Contracts (1982) § 9.7, p. 691).  Further, "[u]nder the doctrine of frustration of purpose, … the event upon which the obligor relies to excuse his performance cannot be an event that the parties foresaw at the time of the contract."  *Id.* at 638.

Defendants' frustration of purpose defense fails because the Remediation Agreement expressly contemplates that EAI must "address[] and remed[y] [the issues] on a time frame and schedule that is conducive to R & I."  *See O'Hara*, 218 Conn. at 639 (holding that frustration of purpose did not apply then the proposed plans for relocation change but "the agreement explicitly acknowledged the possibility that the plans for relocation could be altered").  Defendants point to no evidence that upon signing the Remediation Agreement, EAI was unaware that R & I had the discretion to set the schedule for when EAI would complete the project.  Further, during EAI's second attempt to reupholster the seats, EAI traveled to New Jersey to retrieve the seats from the Aircraft.  Thus, it was plainly foreseeable to EAI that the Plaintiffs might ask EAI to travel to the Aircraft's location to correct its work under the Remediation Agreement.  Of course, as noted, R & I had to exercise its discretion in good faith and there is a question of fact about whether it did.  But that is a far cry from the notion that any delays by R & I frustrated the purpose of the Agreement.

2018, and (3) $15,000 for the custom leather that EAI purchased.[11]  Plaintiffs argue that the counterclaim should be dismissed because (1) EAI anticipatorily breached the Remediation Agreement and, thus, is not entitled to any payments under that agreement, (2) the Remediation Agreement requires EAI to cover the costs, which includes the purchase of the custom leather, and (3) EAI also materially breached Proposal No. 1147 and is not entitled to any payments under that agreement either.  ECF No. 157 at 24; ECF No. 133 at 25.

First, there are genuine disputes of material fact as to whether the invoices from the summer of 2018 are for work under Proposal No. 1147, the Remediation Agreement, or some other agreement.  James testified that EAI performed additional work on the Aircraft during the summer of 2018.  At least some of EAI's work was not covered by Proposal No. 1147.  For example, EAI worked on the Aircraft's headliner and side panels, neither of which are mentioned in Proposal No. 1147.  Instead, Proposal No. 1154 appears to describe EAI's work on the Aircraft's headliner.  Therefore, to the extent that the invoices do not cover work under Proposal No. 1147 or the Remediation Agreement, I deny summary judgment as to those invoices.

Second, because there are genuine disputes of material fact as to whether Plaintiffs breached by acting in bad faith, as shown above, there is also a genuine dispute of material fact as to whether Defendants are entitled to receive compensation for the custom leather.  If Plaintiffs breached the Remediation Agreement, then they cannot sue for anticipatory breach and there would be nothing preventing Defendants from receiving damages for the failure to pay the invoices (to the extent they fall under Proposal No. 1147 and the Remediation Agreement).

I deny summary judgment as to the Defendants' counterclaim.

---

[11] Defendants also assert "set off" as an affirmative defense, stating that the plaintiffs should pay for EAI's unpaid work and materials.  Since this argument is substantially the same as the Defendants' counterclaim, I will analyze it together with the counterclaim.

### D.  There are Genuine Disputes of Material Fact as to Contractual Damages

Plaintiffs argue that they are "entitled to summary judgment[] on damages" because EAI's expert report does not dispute the analysis and conclusions of R & I's expert regarding the cost to complete the work on the Aircraft.  ECF No. 133 at 25.  Because there are genuine disputes of material fact about liability, I cannot use the summary judgment procedure to award damages.  But I would not do so in any event.  Both parties have introduced their own expert reports regarding the appropriate amount of damages.  Both experts arrive at different conclusions.  Further, "a district court has discretion as to the need for a separate hearing on the issue of damages." *PNCEF, LLC v. Omni Watch & Clock Co., LLC*, No. 09-CV-0975 NGG JO, 2010 WL 3861009, at *4 (E.D.N.Y. Sept. 28, 2010) (citing *Tamarin v. Adam Caterers, Inc.,* 13 F.3d 51, 53–54 (2d Cir.1993)).  "The counters of this discretion in the summary judgment context are the same as those in Federal Rule of Civil Procedure 55(b)(2), which governs default judgments." *Id.*  Under the Federal Rule of Civil Procedure 55(b)(2), the "the court may conduct such hearings [for damages] or order such references as it deems necessary and proper."  I do not find either expert report so compelling that I would dispense with a hearing in damages, even if I found that liability was clear.

### E.  CUTPA

Plaintiffs claim that EAI violated CUTPA by (1) fraudulently misrepresenting that EAI would finish the required work on the Aircraft, and (2) acting in bad faith by claiming the Remediation Agreement was void due to the expiration of the warranty.  ECF No. 36 ¶¶ 46, 48. Plaintiffs argue that there is no genuine dispute of material fact that EAI acknowledged deficiencies in its work, entered in the Remediation Agreement to address those deficiencies, accepted $20,000 from R & I, and repudiated its contractual obligations and gave false

justifications.  ECF No. 133 at 32.  Further, Plaintiffs argue that summary judgment is warranted

on damages as a result of the CUTPA claim.  *Id.* at 33.  Because there are genuine disputes of

material fact, I deny summary judgment as to the Plaintiffs' CUTPA claim.

      CUTPA prohibits "unfair or deceptive acts or practices in the conduct of any trade or

commerce."  Conn. Gen. Stat. § 42-110b(a).  To establish a claim under CUTPA, a plaintiff must

prove: "(1) the defendant committed an unfair or deceptive act or practice; (2) the act

complained of was performed in the conduct of trade or commerce; and (3) the prohibited act

was the proximate cause of harm to the plaintiff."  *Pellet v. Keller Williams Realty Corp.*, 177

Conn. App. 42, 62 (2017).  The courts examine three factors to determine whether an act or

practice is unfair under CUTPA: 1) whether it is in violation of public policy as established by

common law or statute, 2) whether it is otherwise immoral, and 3) whether it causes substantial

harm to consumers.  *Tillquist v. Ford Motor Credit Co.*, 714 F. Supp. 607, 616 (D. Conn. 1989)

(citations omitted).  "A CUTPA claim cannot be based simply on a breach of contract, or even an

intentional breach of contract, absent aggravating circumstances. … Conduct including

'[f]raudulent representations, fraudulent concealment, false claims[,] and multiple breaches of

contract,' may amount to substantial aggravating circumstances."  *Waterbury Generation LLC v.*

*Waterbury Land Partners, LLC*, No. 3:20CV01409 (JBA), 2021 WL 4224413, at *2 (D. Conn.

Sept. 16, 2021) (quoting *Bartold v. Wells Fargo Bank, N.A.*, No. 14-cv-00865 (VAB), 2015 WL

7458504, at *6 (D. Conn. Nov. 24, 2015)).

      Plaintiffs submit no evidence that EAI, when it executed the Remediation Agreement, did

not intend to keep its promise to cure the deficiencies with its work.  EAI procured the custom

leather to recover the seats.  And at the April 11, 2019 meeting, James testified that he was

concerned about "honoring the job."  Thus, a reasonable juror could conclude that EAI did not

fraudulently misrepresent that it would fix its work.  Further, there is a genuine dispute of material fact as to whether EAI's refusal to perform was "immoral," "oppressive," or "intentional."  As stated above, there are genuine disputes of material fact as to whether R & I acted in bad faith by setting an unreasonable schedule and demanding EAI to travel to various locations on short notice to retrieve the seats.

I conclude that there are genuine disputes of material fact as to the Plaintiffs' CUTPA claim.

## V.       CONCLUSION

For the reasons above, I grant in part and deny in part the motion for summary judgment (ECF No. 132).  Specifically, I find that the Remediation Agreement is an enforceable contract and grant summary judgment in favor of the Plaintiffs on the Defendants' affirmative defenses of absence of consideration and frustration of purpose.  I deny summary judgment as to the Plaintiffs' breach of contract and CUTPA claims and as to the Defendants' counterclaim and their defense of setoff.  Further, because I granted the Plaintiffs' motion for leave to file excess pages, I deny as moot the Defendants' motion to strike (ECF No. 158).


                                        IT IS SO ORDERED.


                                        _____/s/_____
                                        Michael P. Shea, U.S.D.J.


Dated:  Hartford, Connecticut
        March 28, 2022

29